IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

EMILY DEHN,

                          Plaintiff,                    Case No. 24-2079-DDC-GEB

v.

BOARD OF REGENTS FOR KANSAS
COLLEGES AND UNIVERSITIES,
STATE OF KANSAS ex rel.
UNIVERSITY OF KANSAS MEDICAL
CENTER, UNIVERSITY OF KANSAS,

                          Defendant.

## MEMORANDUM AND ORDER

Plaintiff Emily Dehn filed suit against defendant Board of Regents for Kansas Colleges
and Universities *ex rel.* University of Kansas.[1]  Plaintiff's Complaint alleges disability
discrimination and retaliation in violation of the Americans with Disabilities Act and breach of
implied and express contracts.  Doc. 1.  Now, defendant has filed a Motion to Dismiss (Doc. 11).
Plaintiff responded (Doc. 14), and defendant replied (Doc. 22).  This Order grants in part and
denies in part defendant's Motion to Dismiss (Doc. 11).

### I.    Background

The following facts come from plaintiff's Complaint (Doc. 1).  The court accepts
plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to [her], and

---

[1]     Defendant's motion clarifies that the University of Kansas Medical Center—listed as a defendant
in the Complaint—is not itself a legal entity.  Doc. 12 at 5 n.1.  Instead, it "is simply a campus of the
University of Kansas."  *Id.*  Plaintiff's response doesn't challenge this proposition.

draw[s] all reasonable inferences from the facts" in her favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

### Enrollment in KU's Nursing Program

The University of Kansas Medical Center offers a Nurse-Midwife Doctor of Nursing Practice (DNP) program. Doc. 1 at 4 (Compl. ¶ 13). Plaintiff started that program in summer 2019. *Id.* Program Director Dr. Cara Busenhart provided plaintiff with a study plan in July 2019, which slated plaintiff to graduate in December 2022. *Id.* at 5 (Compl. ¶ 21). Plaintiff repeatedly confirmed her intention to graduate by December 2022. *Id.* at 5 (Compl. ¶¶ 26–27).

### Plaintiff's Disability and Accommodations

Plaintiff is disabled. *Id.* at 4 (Compl. ¶ 16). She suffers from Ulcerative Colitis and Spondyloarthritis. *Id.* Because of these disabilities, plaintiff cannot travel more than 45 minutes from her home for school or for clinical placements. *Id.* (Compl. ¶ 17). Defendant approved disability accommodations for plaintiff in 2019. *Id.* at 6 (Compl. ¶ 30). Specifically, defendant agreed to apply a flexible attendance policy to plaintiff and permit plaintiff to take exams in a separate room. *Id.* In 2022, plaintiff requested—and defendant approved—an accommodation that ensured her clinical rotations would keep her within 45 minutes of plaintiff's home. *Id.* (Compl. ¶ 31).

### Clinical Rotation Placement

Despite these disability accommodations, defendant assigned plaintiff to a clinical rotation that was an hour and 45 minutes away from her home for the summer 2022 term. *Id.* at 6–7 (¶¶ 33, 35–36). Plaintiff expressed concern about this arrangement to Dr. Busenhart, who told plaintiff that she could find a preceptor for clinical placement on her own. *Id.* at 7 (Compl. ¶ 38). When plaintiff acted on this advice and tried to find a preceptor, Dr. Busenhart "harshly

criticized" her and "threaten[ed] to write up [plaintiff] for misconduct and fail her in a course for professional violations." *Id.* (Compl. ¶ 39).

Plaintiff expressed concerns about this situation to several of defendant's representatives. *Id.* at 7–8 (Comp. ¶¶ 40–41, 43). On May 27, 2022, Dr. Busenhart notified plaintiff that she either would need to forfeit her disability accommodations or delay her graduation from December 2022 to May 2023. *Id.* at 8 (Compl. ¶ 44). Plaintiff then provided defendant with a letter from her rheumatologist, who explained that plaintiff needed to remain close to her doctors during her clinical placements. *Id.* (Compl. ¶ 45). Eventually, defendant placed plaintiff in a clinical rotation that was 48 minutes away from her home, and plaintiff accepted this placement. *Id.* at 9 (Compl. ¶¶ 48–49).

### *Graduation Delay*

In May 2022—shortly after plaintiff expressed concern that defendant had violated her disability accommodation—defendant informed plaintiff that she was on track to graduate in May 2023, not December 2022. *Id.* at 9, 10 (Compl. ¶¶ 50–52, 55). Plaintiff could not take two final courses simultaneously in the Fall 2022 semester, resulting in the delay. *Id.* at 9 (Compl. ¶ 52). Specifically, defendant required plaintiff to take a mandatory course—Advanced Clinical Residency—in Spring 2023. *Id.* (Compl. ¶¶ 52–53). That requirement contradicted both the personalized plan of study that defendant previously had provided plaintiff and the DNP Student Manual. *Id.* (Compl. ¶¶ 53–54). Plaintiff disputed this requirement but didn't hear back from defendant about this dispute. *Id.* at 10 (Compl. ¶ 56).

### *DNP Project Delay*

Plaintiff began work on her required DNP project in spring 2022. *Id.* at 11 (Compl. ¶ 60). Plaintiff's project originally was slated to last three semesters. *Id.* But defendant increased the duration of plaintiff's project to five semesters. *Id.* Although two of the three

committee members overseeing plaintiff's project approved plaintiff to move forward, Dr.

Busenhart did not. *Id.* (Compl. ¶ 62). She "delayed a crucial component" of the project

presentation. *Id.* Although defendant eventually removed Dr. Busenhart from plaintiff's project

committee, the delay pushed plaintiff's project back an additional semester. *Id.* (Compl. ¶ 63–

64). Dawn Shew, Assistant Dean of Student Affairs and Enrollment Management, told plaintiff

that she must complete her project during the final semester of the DNP program. *Id.* at 11–12,

16 (Compl. ¶¶ 66, 96). This requirement—which defendant previously hadn't communicated to

plaintiff—added yet another semester to plaintiff's project. *Id.* at 12 (Compl. ¶ 66). In total,

plaintiff alleges that defendant wrongfully delayed her graduation by two-and-a-half years. *Id.*

(Compl. ¶ 68).

### *Failing Grades*

In May 2022, plaintiff filed a formal discrimination complaint against Dr. Busenhart with

defendant's Equal Opportunity and Academic Compliance office. *Id.* (Compl. ¶ 69). But

defendant didn't investigate that complaint. *Id.* (Compl. ¶ 70). In July 2022, plaintiff received

"failing grades on nearly every assignment in NRSG 927, the class in which the accommodations

dispute was prominent," even though plaintiff had "excel[ed] on nearly identical assignments the

previous semester." *Id.* at 13 (Compl. ¶¶ 74–75).

### *Settlement Agreement*

In August 2022, plaintiff threatened to sue defendant. *Id.* at 14 (Compl. ¶ 80). Plaintiff

and defendant subsequently signed a settlement agreement in October 2022. *Id.* (Compl. ¶ 81);

Doc. 12-1 (Settlement Agreement).[2] The settlement agreement includes the following terms,

among others:

---

[2]    The court properly may consider the settlement agreement attached to defendant's motion
because it's "'central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"

- The parties will select a mutually-agreed upon neutral grader to review plaintiff's assignments and re-grade them. Doc. 1 at 14 (Compl. ¶ 82); Doc. 12-1 at 2 (Settlement Agreement § C.1.). Defendant will have only limited ex parte communications with the neutral grader. Doc. 12-1 at 2 (Settlement Agreement § C.3.).

- Defendant will award plaintiff her Doctor of Nursing Practice upon successful completion of all program requirements. Doc. 1 at 14 (Compl. ¶ 83); Doc. 12-1 at 5 (Settlement Agreement § C.12.).

- Defendant will honor plaintiff's disability accommodations and assign her a clinical rotation placement within 45 minutes of her home. Doc. 1 at 14 (Compl. ¶ 85); Doc. 12-1 at 5 (Settlement Agreement § C.10.).

- Defendant will require plaintiff to enroll in only one credit hour of NRSG 964: Advanced Clinical Residency. Doc. 12-1 at 4 (Settlement Agreement § C.8.).

- Plaintiff will release defendant "from any and all liability" "based on or arising out of events . . . occurring through" the signing of the settlement agreement. *Id.* at 1 (Settlement Agreement § A.). Plaintiff won't sue defendant related to any matters covered by the release provision. *Id.* at 1–2 (Settlement Agreement § B.).

### *Neutral Grader Coursework Review*

Plaintiff alleges that the ostensibly neutral grader colluded with defendant's faculty and assigned plaintiff failing grades for the work she regraded. Doc. 1 at 15–16 (Compl. ¶¶ 90, 91). According to plaintiff, the grader made over 130 mistakes when grading nine of plaintiff's assignments. *Id.* at 16 (Compl. ¶ 92). The selection of the grader also violated the settlement agreement's criteria because the grader belonged to the same professional organizations as some of defendant's faculty. *Id.* What's more, defendant didn't allow plaintiff to review ex parte communications between defendant and the neutral grader. *Id.* (Compl. ¶ 94).

---

*Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). The court explains the reasons it's proper to consider this document in § III.A.1, on p. 9.

***Plaintiff's Relocation to Colorado***

In fall 2022, plaintiff's counsel informed defendant that she planned to move from Missouri to Colorado at the start of 2023. *Id.* at 15 (Compl. ¶ 89). Plaintiff changed her address on file with defendant in February 2023, shortly after she moved to Colorado. *Id.* at 16 (Compl. ¶ 95). Defendant placed the burden on plaintiff to find a clinical rotation in Colorado, effectively denying her disability accommodation to keep her clinical rotations within 45 minutes of her home. *Id.* at 17, 20 (Compl. ¶¶ 100–101, 103–05, 119.a). Plaintiff's failure to find a preceptor for her clinical rotations further delayed her graduation. *Id.* at 18 (Compl. ¶ 106).

In May 2023, defendant told plaintiff that she must take an additional credit hour of NRSG 964—a violation of the settlement agreement—and that she couldn't graduate until May 2025. *Id.* at 18, 22 (Compl. ¶¶ 107, 125).

Plaintiff asserts three distinct claims in this lawsuit. She alleges a disability discrimination claim and retaliation claim under the Americans with Disabilities Act.[3] *Id.* at 18–26 (Compl. ¶¶ 132–141). And plaintiff brings a breach of implied—or in the alternative, express—contract claim. *Id.* at 26–28 (Compl. ¶¶ 142–157).

## II.    Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[3]    The ADA Amendments Act of 2008 ("ADAAA") amended the ADA and "went into effect on January 1, 2009." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1303–04 n.1 (10th Cir. 2017) (citation omitted). Here, the "events that form the basis for [plaintiff's] disability-related claims occurred after this date; therefore, the ADAAA is technically applicable here." *Id.* So, the court "refer[s] to [plaintiff's] disability-related claims . . . as claims alleging violations of the ADAAA." *Id.*

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.

at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S.

at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir.

2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible

that the plaintiff is entitled to relief under the relevant law." (citation omitted)).  The Tenth

Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'" *Clinton v.

Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe

Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual

allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion

couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands

more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.*

(quoting *Twombly*, 550 U.S. at 555).

## III.   Analysis[4]

Defendant makes three arguments in its Motion to Dismiss.  *First*, defendant argues that

plaintiff signed a settlement agreement that includes a release and covenant not to sue, which

---

[4]       The parties assume that Kansas law supplies the relevant legal principles of contract law
governing this action.  *E.g.*, Doc. 12 at 4, 7 n.6; Doc. 14 at 9.  The court agrees.  "The Court applies
the forum state's choice-of-law rules to determine which state's substantive law governs a claim." *Nordwald
v. Brightlink Commc'ns, LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022) (citing *Klaxon Co. v. Stentor

precludes plaintiff's federal claims and implied contract claim.  Doc. 12 at 8–14.  *Second*, defendant contends that plaintiff can't state an implied contract claim for relief.  This is so, defendant contends, because (a) she didn't submit her claim to the Kansas Joint Committee on Special Claims; and (b) the alleged implied contract covers the same subject matter as the settlement agreement, an express contract.  *Id.* at 14–16.  And *third*, defendant asserts that plaintiff hasn't state a plausible express contract claim because she didn't bring suit under the Kansas Judicial Remedies Act.  *Id.* at 16–18.  The court tackles these arguments in turn, below.

## A.    Settlement Agreement

The settlement agreement doesn't bar plaintiff's claims.  Defendant first argues that the settlement agreement bars plaintiff's federal ADAAA claims and her implied contract claim.  *Id.* at 8–14.  According to defendant, the settlement agreement contains two provisions—a release and a covenant not to sue—that bar plaintiff from bringing her federal claims or her implied contract claim.  *Id.* at 8; *see also* Doc. 12-1 at 1–2 (Settlement Agreement §§ A, B).  Plaintiff responds that the settlement agreement doesn't apply to her claims, which, she contends, arose after the parties signed the settlement agreement.  Doc. 14 at 7–9.  Plaintiff also argues that she plausibly has alleged a material breach of the settlement agreement contract, relieving her duties under it.  *Id.* at 10–11.  This argument persuades the court.  Before explaining that conclusion, the court takes up the threshold issue of whether it may consider the settlement agreement at all.

---

*Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under Kansas law, contractual choice of law provisions generally are enforceable.  *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 375 (Kan. 2002).  Here, the settlement agreement contains a choice-of-law provision.  It dictates that the agreement "shall be governed by and construed in accordance with the laws of the State of Kansas."  Doc. 12-1 at 6 (Settlement Agreement § L).  So, Kansas law governs plaintiff's contract claim and guides the court's interpretation of the settlement agreement.

### 1. The court may consider the settlement agreement.

Initially, the parties dispute whether the court properly can consider the settlement agreement when deciding this motion. Plaintiff suggests that because she didn't attach the settlement agreement to her Complaint, the court can't consider it when evaluating defendant's affirmative defense that plaintiff released any claims. Doc. 14 at 7. The court disagrees. "A court may consider . . . 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity[.]'" *Matney*, 80 F.4th at 1150 n.11 (quoting *Gee*, 627 F.3d at 1186). Here, the settlement agreement is central to plaintiff's claims. The Complaint references the settlement agreement—by the court's count— at least 25 times. And, plaintiff's express contract claim alleges that defendant violated the settlement agreement. Doc. 1 at 27 (Compl. ¶¶ 149–151). Plaintiff doesn't dispute the authenticity of the settlement agreement that defendant submitted with its Motion to Dismiss. The court thus concludes that it properly may consider the settlement agreement at this stage.

### 2. Plaintiff plausibly has alleged a material breach of contract.

Nevertheless, the court won't dismiss plaintiffs' claims because of the settlement agreement. Plaintiff has pleaded facts which—when viewed in the light most favorable to plaintiff—allege that defendant materially breached the settlement agreement, thus excusing plaintiff's duty to perform her obligations under the same contract. The court thus needn't interpret the settlement agreement and determine whether plaintiff's claims are within the scope of its release and covenant-not-to-sue provisions.

Under Kansas law, when "a party materially breaches a contract, they are precluded from enforcing the contract against the nonbreaching party until the material breach has been cured." *Alenco, Inc. v. Warrington*, 560 P.3d 586, 596 (Kan. Ct. App. 2024); *see also Fed. Land Bank of*

*Wichita v. Krug*, 856 P.2d 111, 115 (Kan. 1993) (explaining that material breach of contract

warrants "recission of a contract").[5]  As our court has explained:

> [T]his doctrine is "based on the principle that where performances are to be
> exchanged under an exchange of promises, each party is entitled to the assurance
> that he [or she] will not be called upon to perform his [or her] remaining duties of
> performance with respect to the expected exchange if there has already been an
> uncured material failure of performance by the other party."

*Lassiter v. Topeka Unified Sch. Dist. No. 501*, 347 F. Supp. 2d 1033, 1041 (D. Kan. 2004)

(second and third alterations in original) (quoting Restatement (Second) of Contracts § 237 cmt.

b (Am. L. Inst. 1981)).

A breach is material if it is "so substantial as to defeat the object of the parties in making

the agreement." *Fed. Land Bank*, 856 P.2d at 115.  When deciding whether a breach is material,

relevant considerations include:  the extent the breach deprives the injured party of the benefit of

the parties' bargain; the extent compensation can cure the injury of the breach; the extent

breaching party will suffer forfeiture; the likelihood the breaching party will cure its failure to

perform; and whether the behavior of the breaching party "comports with standards of good faith

and fair dealing." *Lassiter*, 347 F. Supp. 2d at 1041 (citing Restatement (Second) of Contracts §

241).  Importantly, whether "a party has materially breached a contract is a question of fact for

the jury." *Alenco*, 560 P.3d at 598 (citing *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298

P.3d 250, 264 (Kan. 2013)); *Lassiter*, 347 F. Supp. 2d at 1041 ("Whether a breach rises to the

level of being considered a material breach is a question of fact.").

---

[5]      While not binding on this court, decisions from the Kansas Court of Appeals are persuasive
authority predicting how the Kansas Supreme Court would resolve issues of Kansas law.  *Stickley v. State
Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) ("The decision of an intermediate
appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court
unless it is convinced by other persuasive data that the highest court of the state would decide
otherwise.'" (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)).

Here, plaintiff plausibly has alleged that defendant materially breached the settlement agreement. Plaintiff's Complaint alleges that defendant breached the settlement agreement in several ways. Specifically, plaintiff alleges the following violations of the settlement agreement[6]:

- Defendant colluded with the purportedly neutral grader and concealed communications with the neutral grader from plaintiff. Doc. 1 at 16 (Compl. ¶¶ 91, 94).

- The ostensibly neutral grader belonged to the same professional organizations as KU faculty members and thus wasn't neutral. *Id.* (Compl. ¶ 16).

- Defendant required plaintiff to enroll in an additional credit hour for a required course, NRSG 964. *Id.* at 18 (Compl. ¶ 107).

- Defendant didn't accommodate plaintiff by helping her find clinical rotations within 45 minutes of her home. *Id.* at 20 (Compl. ¶ 119.a).

Taken together as true, these alleged breaches could support a plausible finding that defendant's breaches were "so substantial as to defeat" plaintiff's object "in making the agreement." *Fed. Land Bank*, 856 P.2d at 115. The court thus concludes that plaintiff has alleged plausibly a material breach of the settlement agreement.

Defendant contends that the Complaint didn't allege expressly that defendant committed a "material breach" of the settlement agreement. Doc. 22 at 5. But plaintiff didn't have to allege a material breach expressly. None of plaintiff's claims depend on a *material* breach. The materiality of defendant's alleged breaches only comes into play when plaintiff responds to defendant's affirmative defense. And a "complaint need not anticipate any affirmative defense that may be raised by the defendant[.]" *Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019) (citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)). Regardless, the

---

[6]    Appendix A compares the allegations of the Complaint to the text of the settlement agreement for each of these alleged breaches.

court must "examine the substance" of the Complaint and "not rely solely on labels." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107–08 (10th Cir. 2009) (quotation cleaned up). Doing so, the court concludes that plaintiff has recited facts—when taken as true—that plausibly allege defendant materially breached the settlement agreement.

The next issue, then, is whether defendant's material breach of the settlement agreement can excuse plaintiff's obligations in the release and covenant-not-to-sue provisions of the settlement agreement. It can. Our court addressed the very same issue in *Lassiter*. 347 F. Supp. 2d 1033. There, plaintiff and defendant had signed an agreement that contained a release and waiver provision. *Id.* at 1040–41. When plaintiff sued defendant, defendant sought to enforce the release and waiver provisions. *Id.* Our court applied Kansas law to resolve the question. And because plaintiff had alleged that defendant materially breached the agreement by violating a confidentiality clause, our court refused to enforce the release and waiver provisions. *Id.* at 1041–42 ("[T]he court cannot say that that [plaintiff's] complaint fails to state a claim solely by virtue of the waiver and release provision in the resolution because defendants' alleged breach of the confidentiality provision was arguably sufficiently material to excuse plaintiff's obligation to perform under the contract.").

Trying to avoid this problem, defendant argues that a material breach only can "excuse a party's *future* performance." Doc. 22 at 5 (emphasis in original). And, according to defendant, "the release was effective and complete on the date the" parties signed the settlement agreement. *Id.* Defendant's argument, though an interesting one, finds no support in Kansas law. Kansas law allows a nonbreaching party to *rescind* a contract following a material breach. *E.g.*, *Fed. Land Bank*, 856 P.2d at 115; *In re Johnson's Estate*, 452 P.2d 286, 292 (Kan. 1969) ("To warrant *rescission* of a contract for breach of contract, the breach must be material and the failure to

perform so substantial as to defeat the object of the parties in making the agreement." (emphasis added)).  The Kansas Supreme Court has explained that "upon recission of a contract the parties must be placed in substantially the same condition as they were when the contract was executed." *Fed. Land Bank*, 856 P.3d at 115.  Putting plaintiff in the same position she occupied when the parties signed the settlement agreement means the release and covenant-not-to-sue provisions wouldn't encumber her here.  In a recent and published decision, the Kansas Court of Appeals expressed the material breach doctrine in broader terms than defendant's argument here accredits.  Here's what the Kansas appellate court had to say on this question:  "When a party materially breaches a contract, they are precluded from *enforcing the contract* against the nonbreaching party until the material breach has been cured." *Alenco*, 560 P.3d at 596 (emphasis added).  This expression of this Kansas doctrine implies that if defendant here materially breached its settlement agreement with plaintiff, defendant lost its right to enforce the release or covenant-not-to-sue provisions in the same agreement.

Defendant cites just one on-point case to support its position about future performance. Doc. 22 at 5.  In *Waste Management, Inc. v. Danis Industries Corp.*, the Southern District of Ohio—applying Ohio law—held that a material breach of contract could not excuse a release because the plaintiff already had completed the performance required by the release.  No. C-3-00-256, 2004 WL 5345389, at *9 (S.D. Ohio Feb. 24, 2004).[7]  The court's research didn't reveal any other cases adopting *Waste Management*'s view of release provisions.  In contrast, like *Lassiter*, many courts have held that a material breach may render a release or waiver provision

---

[7]    Defendant also cites *National Pasteurized Eggs, LLC v. Davidson*, No. 07-103-JL, 2011 WL 6257307, at *15 (D.N.H. Dec. 15, 2011), for the proposition that a party cannot revoke prior performance in response to a material breach.  Doc. 22 at 5.  But *Davidson*'s context isn't about a release provision. Instead, it involved a party seeking to revoke an assignment of intellectual property.  *Davidson*, 2011 WL 6257307, at *15.

unenforceable.[8] *E.g.*, *Weisman v. N.J. Dep't of Human Servs.*, 817 F. Supp. 2d 456, 461 (D.N.J. 2011) ("Because Defendants have materially breached the settlement agreement and deprived [plaintiff] of the benefit of her bargain, [plaintiff] is excused from performance of her obligation under the agreement to release all claims related to the disciplinary action.") (applying New Jersey law); *PolyVision Corp. v. Fives ST Corp.*, No. 22-CV-150-RAW, 2024 WL 3834183, at *4 (E.D. Okla. Aug. 15, 2024) (denying summary judgment based on contractual release because breach of contract "could preclude [defendant] from enforcing the terms of the release if true") (applying New York law); *Cain v. Price*, 415 P.3d 25, 29 (Nev. 2018) (applying Nevada law and characterizing a release as a "promise" and holding that material breach relieved party of that promise); *see also United States v. Guzman*, 318 F.3d 1191, 1195 (10th Cir. 2003) (explaining that an appeal "waiver provision may be unenforceable if the government breaches the terms of the Plea Agreement").

Given *Lassiter*, the Kansas Supreme Court's explanation of the material breach doctrine, the Kansas Court of Appeals' language in *Alenco*, and the weight of authority generally, the court concludes that plaintiff's allegations could render unenforceable the release and covenant-not-to-sue provisions in the settlement agreement.  In short, plaintiff has alleged plausibly that defendant materially breached the settlement agreement.  This material breach, if adopted by a jury finding, could allow plaintiff to rescind the settlement agreement.  So, at this procedural juncture, the court can't conclude that the release and covenant-not-to-sue provisions bar plaintiff's claims.

---

[8]    When interpreting issues of state law in the absence of a ruling from the state's highest court, federal courts properly may consider "'the general weight and trend of authority in the relevant area of law.'" *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 948 (10th Cir. 2018) (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007)).

Next, the court takes up defendant's failure to exhaust argument.

## B.    Failure to Exhaust

Defendant next argues that plaintiff can't state a claim for relief based on an implied contract because she didn't follow procedures mandated by Kansas law.  Doc. 12 at 14–15.[9]  Specifically, defendant argues that two Kansas statutes—Kan. Stat. Ann. §§ 46-903 and 46-907—require litigants to submit claims against the state based on implied contracts to the Joint Committee on Special Claims.  Doc. 12 at 14.  Plaintiff's sole response is that defendant's argument is an affirmative defense.  Doc. 14 at 11.  So, according to plaintiff, the Complaint doesn't establish definitively the affirmative defense, and the court shouldn't dismiss her implied contract claim.  *Id.*  Defendant counters that bringing an implied contract claim before the Joint Committee on Special Claims is a condition precedent for plaintiff's claim.  Doc. 22 at 6.  Defendant has the better of this dispute.

To maintain a claim against Kansas[10] based on an implied contract, a plaintiff must submit the claim to the Joint Committee on Special Claims before bringing suit.  *Wheat v. Finney*, 630 P.2d 1160, 1163 (Kan. 1981) (citing Kan. Stat. Ann. §§ 46-903 & 46-907); *Sharp v. State*, 783 P.2d 343, 347 (Kan. 1989) (same).  And defendant is right.  This exhaustion requirement isn't an affirmative defense.  It's a condition precedent.  *Wheat*, 630 P.2d at 1163–64 ("K.S.A. 1980 Supp. 46-903 and 46-907 provide a statutory requirement that claims based on implied contracts be filed with a special claims committee; such filing and processing are held to

---

[9]    Defendant also argues that Kansas law doesn't allow implied contract claims when an express contract covers the same subject matter.  Doc. 12 at 15–16.  The court needn't consider that argument because it dismisses plaintiff's implied contract claim based on defendant's failure to exhaust argument.

[10]    The Kansas Board of Regents and public universities are "arms of the State" of Kansas.  *Minjarez-Almeida v. Kan. Bd. of Regents*, 527 P.3d 931, 939 (Kan. Ct. App. 2023) (citing *Wilson v. Kan. State Univ.*, 44 P.3d 454, 456 (Kan. 2002)).

be conditions precedent to the maintenance of an action."); *Sharp*, 783 P.2d at 347 ("[A]n action in implied contract . . . may not be maintained against the State unless plaintiffs have previously filed a claim on which payment has been denied." (citation omitted)).  Plaintiff's Complaint here never alleges that she filed any claim with the Joint Committee.  So, plaintiff hasn't stated a plausible claim for relief based on the breach of an implied contract.  *See Minjarez-Almeida*, 527 P.3d at 941 ("Because the plaintiffs did not file their implied-contract claims . . . with the Joint Committee on Special Claims before initiating their lawsuits, *Wheat* and *Sharp* dictate that those claims cannot go forward.").  The court thus is duty-bound by Kansas Supreme Court precedent to dismiss plaintiff's implied contract claim.[11]

## C.    Kansas Judicial Review Act

Defendant's final argument contends that plaintiff's express contract claim fails because plaintiff didn't bring it under the Kansas Judicial Reform Act (KJRA).  Doc. 12 at 16–18. Defendant contends that plaintiffs suing Kansas agencies for breach of contract must sue under the KJRA, which requires litigants to seek judicial review within 30 days of the agency action they challenge.  *Id.* at 17 (citing Kan. Stat. Ann. § 77-613(b)).  Plaintiff responds that the KJRA doesn't apply to her claims because they don't challenge an agency action within the meaning of

---

[11]    Kan. Stat. Ann. §§ 46-903 and 46-907 suggest that the requirement to bring claims to the Joint Committee on Special Claims just applies when a plaintiff seeks legal, not equitable, relief.  Kan. Stat. Ann. § 46-903 ("No *money* or *funds* shall be disbursed . . . unless the *payment* . . . has been specifically authorized by act of the legislature." (emphasis added)); *Id.* § 46-907 ("All claims proposed *to be paid* . . . shall be submitted to the joint committee on special claims[.]" (emphasis added)).  *See also Wheat*, 630 P.2d at 1163–64 ("An action may not be maintained against the State without first filing a claim on which *payment* is denied." (emphasis added)).  That is, these statutes *may* not bar equitable relief.  And here, plaintiff seeks both legal and equitable relief.  Doc. 1 at 28–29 (Prayer for Relief).  But the court lacks jurisdiction to grant equitable relief "when a plaintiff alleges that a state official has violated *state* law." *Pennhusrt State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (emphasis in original); *see also EagleMed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) ("A federal court may not enjoin a state official to follow state law.  Fundamental precepts of comity and federalism admit of no other rule." (quotation cleaned up)).  So, the court dismisses plaintiff's implied contract claim in full.

the KJRA.  Doc. 14 at 13–17.  The court agrees with defendant.  The KJRA bars plaintiff's

express contract claim, so the court dismisses it.

The KJRA "'establishes the *exclusive means* of judicial review of agency action.'"  *Jones*

*v. State*, 109 P.3d 1166, 1169 (Kan. 2005) (emphasis in original) (quoting Kan. Stat. Ann. § 77-

606).  State educational institutions are state agencies for purposes of the KJRA.  *Gaskill v. Fort*

*Hays State Univ.*, 70 P.3d 693, 695 (Kan. Ct. App. 2003).  The act provides a sweeping

definition of "agency action," one that "includes an agency's 'performance of, or failure to

perform, any other duty, function or activity, discretionary or otherwise.'"  *Jones*, 109 P.3d at

1169 (quoting Kan. Stat. Ann. § 77-602(b)(3)).  And the Kansas Supreme Court has held that

violations of contractual duties come within the KJRA's definition of "agency action."  *See id.*

(holding that agency's failure to perform contractual duty to provide insurance coverage

qualified as "agency action").

Plaintiff argues that the KJRA doesn't apply to her suit.  Doc. 14 at 12–17.  She argues

that none of the cases defendant cites involve a student suing a university.  *Id.* at 12.  And she

contends the Kansas Supreme Court has limited the KJRA's scope to "only those actions that are

taken in furtherance of the duties the agency exists to perform, and for which the agency can

provide the relief sought through administrative review[.]"  *Id.* at 15.  But that's not quite how

the Kansas Supreme Court has articulated the scope of the KJRA.  The Kansas Supreme Court

has explained that "[o]nly actionable claims which fall outside the authority of an agency to

grant can support a separate action by an aggrieved party."  *Heiland v. Dunnick*, 19 P.3d 103,

107 (Kan. 2001) (internal quotation marks and citation omitted).  From that principle, the Kansas

high court has adopted "a general rule that torts committed by a state agency fall outside the

KJRA's purview."  *Hill v. State*, 448 P.3d 457, 465 (Kan. 2019); *Lindenman v. Umscheid*, 875

17

P.2d 964, 972 (Kan. 1994) ("[T]he KJRA does not apply to civil tort actions against an administrative agency[.]").  Plaintiff's argument that the KJRA doesn't govern her claim fails for two reasons.

*First*, plaintiff hasn't identified a single case where a Kansas court has held that the KJRA doesn't apply to a contract claim against a Kansas agency.  To the contrary, Kansas courts have held repeatedly that contract claims against state agencies must proceed through the KJRA. *E.g.*, *Schall v. Wichita State Univ.*, 7 P.3d 1144, 1163 (Kan. 2000) ("The KJRA was [plaintiff's] only remedy for his breach of contract claim."); *Reifschneider v. State*, 969 P.2d 875, 877 (Kan. 1998) (holding that district court properly dismissed contract claim against Kansas Lottery because plaintiffs' "sole remedy for relief was action under the KJRA"); *10TH St. Med., Inc. v. State*, 210 P.3d 670, 673 (Kan. Ct. App. 2009) ("A breach of contract claim against the State of Kansas, or one of its agencies, must be brought in a Kansas Act for Judicial Review and Civil Enforcement of Agency Actions proceeding if the action being challenged meets the statutory definition of 'agency action[.]'"); *Crossland Constr. Co. v. Otis Elevator Co.*, 432 P.3d 111, 2018 WL 6816555, at *17 (Kan. Ct. App. 2018) ("But precedent establishes that when our Supreme Court actually considers a breach of contract, it has consistently held that plaintiffs bringing a breach of contract claim against a state agency must do so under the KJRA *regardless of the underlying subject of the contract at issue*." (emphasis in original)).  And while it's true that none of these cases emerged from precisely the same context as this one—that is, a student suing a university—that's a distinction that makes no difference.

*Second*, plaintiff doesn't explain why defendant couldn't have reviewed plaintiff's Complaint fairly and granted the relief she sought.  The Kansas Legislature expressly has granted authority to state universities to contract.  *Crossland Constr.*, 2018 WL 6816555, at *16 ("[T]he

Legislature recognized that the power to contract was central to the functioning of state universities."). And defendant has an extensive grievance and review process.[12] So *Heiland*'s admonition that the KJRA doesn't cover "claims which fall outside the authority of an agency" is of no moment here. 19 P.3d at 107. Plaintiff also argues that defendant didn't have authority to violate the settlement agreement "through an ongoing and intentional pattern of retaliation and discrimination[.]" Doc. 14 at 17. Maybe so. But that doesn't prove that the KJRA doesn't apply here. The KJRA says that the "failure to perform" a duty qualifies as "agency action." Kan. Stat. Ann. § 77-602(b)(3).

Here's the bottom line: A chorus of Kansas appellate courts plainly has held that the KRJA applies to contract actions against Kansas agencies. Plaintiff's arguments don't persuade the court to break from this consistent precedent. The court holds that the KJRA applies to plaintiff's express contract claim against defendant. So, the KJRA provides plaintiff's "only remedy for [her] breach of contract claim." *Schall*, 7 P.3d at 1163. The KJRA requires litigants to file a "petition for judicial review of agency action . . . within 30 days after the agency action[.]" Kan. Stat. Ann. § 77-613(d); *Douglass v. Kan. State Univ.*, 915 P.2d 782, 783–84 (Kan. Ct. App. 1996) (holding that KJRA's 30-day statute of limitations period applies to breach of contract claim). Plaintiff didn't comply with that requirement. *See generally* Doc. 1 (Compl.) (showing a filing date of March 2024 but describing events that occurred in 2023 and earlier). The court thus dismisses plaintiff's express contract claim.

---

[12]     *See University Student Complaints*, The Kansas Board of Regents, https://www.kansasregents.org/students/university_student_complaints#pol-complaint (last visited Dec. 19, 2024). The court may take judicial notice of this publication. *See Valiente v. Dineequity, Inc.*, No. 08-2416-KHV, 2009 WL 1226743, at *1 (D. Kan. May 1, 2009) ("Courts often take judicial notice of various public records, including legislative committee reports and publications made by various administrative agencies.").

**IV.    Conclusion**

For reasons explained, the court grants defendant's Motion to Dismiss (Doc. 11) in part.

The court dismisses plaintiff's breach of contract claim (Count III)—whether implied or

express—for failure to state a claim.  In all other respects, the court denies defendant's Motion to

Dismiss (Doc. 11).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion to

Dismiss (Doc. 11) is granted in part and denied in part.  The court dismisses Count III.  All other

counts survive.

**IT IS SO ORDERED.**

**Dated this 22nd day of January, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**

## V.    Appendix A

| Plaintiff's Allegation | Settlement Agreement |
|---|---|
| "The alleged neutral grader chosen by KU to grade Ms. Dehn's assignments per the terms of the Settlement Agreement, Amy Giles from Baylor University, colluded with DNP faculty not to change Ms. Dehn's previously failing grades on assignments." Doc. 1 at 16 (Compl. ¶ 91). | "The University agrees the School of Nursing and Program faculty will not have ex parte communications with the neutral grader unless those communications are first reviewed and approved by Dehn.  Dehn agrees the School of Nursing may communicate with the neutral grader about logistics. . . . To the extent such communications address scope of work, Dehn will be provided an opportunity to review and approve such scope consistent with this Agreement."  Doc. 12-1 at 2 (Settlement Agreement § C.3.). |
| "KU also prohibited Ms. Dehn from reviewing any communications between KU faculty and any neutral grader to determine whether the graders are truly unbiased."  Doc. 1 at 16 (Compl. ¶ 94). | |
| "Ms. Giles also belongs to the same professional organizations as KU faculty members, leading to the reasonable conclusion that she is not neutral as required by the Settlement Agreement."  Doc. 1 at 16 (Compl. ¶ 92). | "The University will not propose a neutral grader with whom Program faculty have a personal or professional relationship or other conflict of interest."  Doc. 12-1 at 2 (Settlement Agreement § C.1.). |
| "KU informed Ms. Dehn that her graduation was being delayed further and her course hours altered, by adding an additional credit hour of NRSG 964, despite the Settlement Agreement stating Ms. Dehn would only be required to take 1 credit hour of NRSG 964." Doc. 1 at 18 (Compl. ¶ 107). | "Given the number of clinical hours Dehn has and will have completed at that point, Dehn shall only be required to enroll in one (1) credit hour of the NRSG 964 course."  Doc. 12-1 at 4 (Settlement Agreement § C.8.). |
| "DNP program faculty den[ied] Ms. Dehn's requested reasonable accommodations that her clinical rotations be within 45 minutes from her home after she moved to Colorado." Doc. 1 at 20 (Compl. ¶ 119.a). | "The University agrees that each clinical placement for Dehn will be in accordance with Dehn's approved disability accommodations, including placement at a clinical site or sites within approximately 45 minutes of Dehn's home[.]"  Doc. 12-1 at 5 (Settlement Agreement § C.10.). |