# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| EMILY DEHN | |
| *Plaintiff*, | Case No. 2:24-CV-02079-DCC-GEB |
| v. | |
| THE KANSAS BOARD OF REGENTS FOR KANSAS COLLEGES AND UNIVERSITIES, STATE OF KANSAS *ex rel.* UNIVERSITY OF KANSAS MEDICAL CENTER AND UNIVERSITY OF KANSAS, | |
| *Defendants*. | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Emily Dehn submits this brief in opposition to Defendants' motion pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings seeking dismissal of Plaintiff's claims under Title II ("Title II") of the Americans with Disabilities Act ("ADA"). Dehn voluntarily dismisses her claims for emotional distress damages. However, for the reasons set forth below, Defendants' motion with respect to dismissal of the Title II claims should be denied in full.

## INTRODUCTION

Dehn's Complaint brings claims against Defendants for violations of Title II of the ADA and Section 504 of the Rehabilitation Act of 1973 ("Section 504") premised on their continued discrimination against her based on her disability and retaliation for her prior advocacy and complaints regarding earlier discrimination. Defendants now move for judgment on the pleadings, asserting that Dehn's ADA claims are barred by Defendants' Eleventh Amendment and sovereign immunity.

1

Defendants do not challenge Dehn's ability to proceed under Section 504, which has near complete overlap with her Title II claims. Accordingly, the Court need not, and should not, reach the constitutional questions presented by Defendants as a ruling on those questions at this stage will have no impact on proceedings. However, even if the Court did reach the question of whether Congress validly abrogated states' sovereign immunity in Title II, Defendants' motion would fail. Dehn, while electing to proceed under the ADA and Section 504, alleges conduct constituting a constitutional violation, and, in any case, Title II is a congruent and proportional remedy to the ongoing pattern of unconstitutional, irrational disability discrimination in public education at all levels that Congress sought to address in passing Title II. Defendants' motion on this front should therefore be denied.

Dehn voluntarily dismisses her claims for damages for emotional distress.

## FACTS

Ms. Dehn was a student in the University of Kansas Medical Center's ("KUMC") Nurse-Midwife Doctor of Nursing Practice ("DNP") Program. Complaint ¶ 2. She was slated to complete the program in December 2022. Complaint ¶¶ 22-28. During the program, Ms. Dehn sought disability accommodations from KUMC. Complaint ¶¶ 30-31. KUMC repeatedly failed to provide these accommodations and, following Ms. Dehn's informal and then formal complaints, further retaliated and discriminated against her, including through a delay in her graduation date, a change in graduation requirements, and discriminatory grading. Complaint ¶¶ 33-44, 47-59, 73-79.

KUMC and Ms. Dehn entered into a settlement agreement in October 2022 to resolve only existing discrimination and retaliation claims. Complaint ¶ 81. Under that Agreement, among other items, KUMC was to provide a neutral grader to regrade Ms. Dehn's work in the class she purportedly failed in line with the requirements for the assignment to be provided to the grader,

give Ms. Dehn access to all communications with that neutral grader, provide her with the agreed-upon accommodation for her clinical placements to be placement within 45 minutes of her home, abide by the remaining course and clinical hours requirements for Ms. Dehn set forth in the agreement, and award Ms. Dehn her DNP upon completion of all curricular requirements. Complaint ¶¶ 82-85. At the time the parties entered the agreement, Ms. Dehn already had informed Defendants that she was moving to Colorado in January 2023. Complaint ¶ 89. KU did not indicate any issue with her plan. Complaint ¶ 97.

Following execution of the agreement, KU continued to discriminate and retaliate against Ms. Dehn, including through intentional and bad faith breach of the settlement agreement. Complaint ¶¶ 86-88, 119, 136. This included asserting that Ms. Dehn could not complete her clinical hours in Colorado, despite never having raised that issue prior to entering the agreement, and thus failing to provide her with a placement within 45 minutes of her home as required by her accommodations, and further ignoring her requests for assistance. Complaint ¶¶ 95-105,148, 151. KU's discrimination and retaliation also included failing to ensure a neutral grader who would grade Ms. Dehn's assignments in line with the agreement, delaying Ms. Dehn's graduation beyond what was agreed to in the agreement, and imposing coursework beyond that permitted by the agreement before it would award Ms. Dehn her DNP and beyond that required of other students who had not advocated for accommodations or their rights under the ADA. Complaint ¶¶ 90-94, 107, 148, 151.

## ARGUMENT AND AUTHORITIES

### A.   THE COURT NEED NOT REACH DEFENDANTS' CONSTITUTIONAL ARGUMENTS AT THIS STAGE AS DEHN'S IDENTICAL SECTION 504 CLAIMS WILL REMAIN

As an initial matter, because Defendants do not challenge Dehn's claim under Section 504 (with the exception of emotional distress damages), the Court need not and should not reach the

question of whether Title II validly abrogates Defendants' Eleventh Amendment and sovereign immunity. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996). As the Defendants recognize, a ruling on the validity of her Title II claim will not impact Plaintiff's ability to proceed with her overlapping claims under Section 504 of the Rehabilitation Act at this point. *See Hamer v. City of Trinidad*, 924 F.3d 1093, 1099 (10th Cir. 2019) (holding that, "because Title II and section 504 essentially involve the same substantive standards, we analyze them together.") (quotation and citation omitted). Defendants make no claim that a ruling on the validity of Dehn's Title II claim will somehow change the scope or nature of these proceedings, and thus the court need not, and thus should not, rule on this question at this juncture. *See Lyng*, 485 U.S. at 445; *Cusumano*, 83 F.3d at 1250.

**B.    TITLE II VALIDLY ABROGATES ELEVENTH AMENDMENT AND SOVEREIGN IMMUNITY IN THIS CASE**

To the extent the Court determines it must reach the question, it should nonetheless find that Title II validly abrogates Defendants' Eleventh Amendment and sovereign immunity. The United States Supreme Court outlined the three-step analysis to determine whether Title II validly abrogates sovereign immunity in *United States v. Georgia*, 546 U.S. 151, 159 (2006). Under that analysis, a court must (1) determine whether the alleged conduct violates Title II; (2) determine the extent to which that conduct also violates the Fourteenth Amendment; and, (3) if the conduct violates Title II but not the Fourteenth Amendment, determine the extent to which Title II's purported abrogation of sovereign immunity regarding that class of cases is nonetheless valid. *Id.; Brooks v. Colorado Dep't of Corr.*, 12 F.4th 1160, 1168 (10th Cir. 2021). As Defendants do not challenge that Dehn has alleged a violation of Title II, only the second and third steps are at issue

4

here.   As outlined below, Dehn has adequately pled conduct that violates the Fourteenth Amendment, and, even if she had not, Title II validly abrogates sovereign immunity with respect to cases involving public education.

  **1.  Dehn Has Alleged Conduct Violating Procedural and Substantive Due Process**

  The second step of the analysis under *Georgia* does not require that a plaintiff actually plead a cause of action for a constitutional violation so long as the conduct alleged to have violated Title II also violates the Fourteenth Amendment.  *See Georgia*, 546 U.S. at 159.  Here, Dehn alleges that Defendants violated Title II through disability discrimination and retaliation for her advocacy by denying her an accommodation regarding the distance of her clinical rotation; failing to provide her with approved reasonable accommodations; misleading Dehn and misrepresenting that she would be able to complete her clinical rotations in Colorado in retaliation for her advocacy; and subjecting her to hostility, negative treatment, harsher judgment and grading, and unreasonable graduation requirements as compared to other students in the DNP Program because she requested or made use of accommodations and because of her disability and associated symptoms. Complaint ¶ 119.  In short, Dehn alleges that Defendants intentionally discriminated against her and/or retaliated against her as a result of her disability, use of accommodations and related advocacy in taking each of these actions.   Defendants' refusal to provide necessary accommodations in scheduling her clinical rotations and their actions in misrepresenting that it would allow her to complete her rotations in Colorado have effectively prevented her from graduating entirely.

  The Tenth Circuit has held that "university students have a property interest in their continued education." *Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018); *Harris v. Blake*, 798 F.2d 419, 424 (10th Cir. 1986).  A student precluded from continuing in her education may

therefore establish a violation of substantive due process where the university's decisions were arbitrary, lacked a rational basis, or shocked the conscience. *See Yeasin*, 719 F. App'x at 852. Similarly, a student may state a violation of procedural due process where a university's decision to preclude the student from continuing in the program was not the result of a careful, deliberate academic judgment. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001). In both claims, while courts owe deference to the legitimate academic judgments of a university, that deference disappears "when, as here, the decisionmaker is 'accused of concealing nonacademic or constitutionally impermissible reasons' for its action." *Id.* (quoting *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

Here, Dehn alleges that the grading and clinical assignment decisions, and refusal to provide accommodations, that ultimately led to her inability to progress towards graduation were based on impermissible disability discrimination and retaliation, not careful and deliberate academic judgment. This conduct therefore alleges a violation of both procedural and substantive due process such that, under *Georgia,* Title II validly abrogates Defendants' immunity. *See Georgia*, 546 U.S. at 159; *Yeasin*, 719 F. App'x at 852; *Gossett,* 245 F.3d at 1181; *Babakr v. Goerdel*, No. 20-2037-SAC-JPO, 2021 WL 736323, at *20 (D. Kan. Feb. 25, 2021) (allegations that a student's dismissal was a result of impermissible retaliation were sufficient to state a claim for a violation of procedural and substantive due process).

### 2. Title II Validly Abrogates Sovereign Immunity With Respect to Disability Discrimination in Public Education

The Court need only reach the question of whether Title II validly abrogates sovereign immunity in cases of disability discrimination where there is no constitutional violation if it concludes that Dehn has not sufficiently pled claims under Section 504 and the alleged conduct forming the basis for her Title II claims also does not violate the Constitution. However, should

the Court so conclude, it must proceed to the third step of the *Georgia* analysis.  But Defendants'

motion fails to include any argument, analysis or, indeed, discussion of this step, resting in full on

its assertion that Dehn has failed to plead a constitutional violation.  However, the third step exists

because Title II may nonetheless validly abrogate a state's sovereign immunity even where an

individual plaintiff does not allege conduct violating the fourteenth amendment.  *See Nevada Dep't*

*of Hum. Res. v. Hibbs*, 538 U.S. 721, 721–22 (2003) (holding that "Congress may enact so-called

prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter

unconstitutional conduct").  Because Defendants do not present argument regarding the third step

of the *Georgia* analysis in their motion, they have failed to establish their entitlement to judgment

on the pleadings and their motion should be dismissed in full.  *See Park Univ. Enters., Inc. v. Am.*

*Cas. Co. Of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006) ("Judgment on the pleadings

should not be granted unless the moving party has clearly established that no material issue of fact

remains to be resolved and the party is entitled to judgment as a matter of law.") (quotation and

citation omitted).

   Even if Defendants had presented argument on the third step, their motion would still fail.

*Tennessee v. Lane,* 541 U.S. 509 (2004) controls the analysis required for the third step under

*Georgia,* requiring the court to examine the right Congress sought to enforce, the extent to which

its remedy was responsive to a pattern of unconstitutional discrimination, and finally whether the

remedial measure constitutes a congruent and proportional response.  *Lane*, 541 U.S. at 519–520;

*City of Boerne v. Flores*, 521 U.S. 507, 532 (1997); *Brooks*, 12 F.4th at 1168.

   Congress may validly abrogate "a State's sovereign immunity when it does so pursuant to

a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive

guarantees of that Amendment."  *Lane*, 541 U.S. at 518.  This "includes the authority both to

remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000). To determine whether prophylactic legislation that proscribes constitutional conduct is nonetheless a valid exercise of Congress's power, courts must determine whether there is a "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520.

Under *Boerne*, courts must first identify the constitutional right or rights Congress sought to enforce in enacting the legislation, and then determine whether Congress identified a pattern of unconstitutional conduct by states requiring a remedy. *Id.* at 529–36. Once those are established, the court looks to whether the right and remedies in the legislation are congruent and proportional given the constitutional right sought to be enforced and the record of violations in front of Congress. *Id.*

The Supreme Court applied this test to Title II in *Lane*, which involved a claim by a defendant who was denied the ability to appeal to answer to criminal charges due to a lack of accessibility and a court reporter who had missed out on work opportunities due to a lack of accessibility. *See Lane*, 541 U.S. at 513-14. The Supreme Court considered the constitution right, or rights, Title II sought to enforce, identifying a prohibition on irrational disability discrimination, as well as an infringement on other constitutional rights, includes those implicated by access to judicial proceedings. *Id.* at 522-523. It then considered what history of discrimination Congress had in front of it. In doing so, the Court did not consider evidence of discrimination solely with respect to court access, but rather the history of discrimination in the provision of public services and programs generally, including not just access to courthouses and court proceedings, but also to public services and programs in state-owned buildings generally. *Id.* at 524-57. It considered

not just barriers to participation by defendants, or work opportunities, but also a failure to provide accommodations to allow individuals to serve on juries, the prohibition on testimony from adults with developmental disabilities, and the physical accessibility of courts to witnesses. *Id*. The Court noted that the explicit finding of Congress that discrimination against individuals with disabilities persisted in areas such as "access to public services" combined with "the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services" was a sufficient pattern of disability discrimination and that "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Lane*, 541 U.S. at 528-529.

Having concluded a sufficient history of irrational, and thus unconstitutional, discrimination against individuals with disabilities in access to public services, the Court in *Lane* moved to analyzing whether Title II was an appropriate response to that history. It was at this point that the Court narrowed its analysis to consider whether the ADA was a proportional and congruent remedy as it related specifically to access to the courts and judicial services. *Id*., 541 U.S. at 531.

While some circuits have read *Lane* as concluding that Title II meets the first and second step of *Boerne* in any case, the Tenth Circuit has joined the First, and recently the Second, in taking a narrower view, finding that, despite its statements, the *Lane* Court instead required analysis of both the question of right and history of discrimination in terms of the specific case at issue (access to courts). *See Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012); *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006) ("We believe the sounder approach is to focus the entire *City of Boerne* test on the particular category of state conduct at issue."); *T.W. v. New York State Bd. of L.*

*Examiners*, 110 F.4th 71, 83 (2d Cir. 2024); *but see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) ("After *Lane,* it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services."); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 554 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007); *Klingler v. Dir., Dep't of Revenue, State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006) ("The Supreme Court has held that Title II sought to enforce a variety of basic constitutional guarantees, including the fourteenth amendment's prohibition on irrational disability discrimination and some of the rights protected by the due process clause."); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004).

Even under the Tenth Circuit's approach, however, the contours of the right and nature of the case still maintain some breadth. In *Guttman*, the court considered a claim by an individual seeking a medical license. *See Guttman*, 669 F.3d at 1118. The court did not define the right at issue as the right to receive a medical license, or practice medicine, but rather the right of individuals with disabilities to practice their chosen profession, and thus looked to the history of discrimination against individuals with disabilities regarding this specific right. *See id.* at 1118-1119. Thus, the narrow approach to defining the relevant right taken by the court in *McCulley v. Univ. of Kansas Sch. of Med.*, No. 12-2587-JTM, 2013 WL 1501994, at *3 (D. Kan. Apr. 10, 2013), referenced by Defendants, is not consistent with the holding of *Guttman*.

While the Tenth Circuit has not reached the question of whether Title II validly abrogates sovereign immunity in cases involving education, the First Circuit, whose approach the Tenth Circuit has adopted, has considered that question. In *Toledo v. Sanchez*, the First Circuit

considered a failure to accommodate claim brought by a university student forced to drop out of the university's School of Architecture. 454 F.3d at 36. The First Circuit found that the right at issue was the due process and equal protection clause's prohibitions on disability discrimination in public education, noting the significance of access to public education at *all* levels, including higher education, recognized by the Supreme Court. *Id*.

The court then reviewed the history of discrimination in front of Congress in public education generally, noting the persistent exclusion of students with disabilities from K-12 education, the enactment of the Rehabilitation Act, which sought to forbid discrimination against students with disabilities at all levels of education, and the continuation of such discrimination despite this and other legislation, including as evidenced by testimony in front of Congress "by numerous disabled individuals who had been excluded from participation or faced irrational prejudice at all levels of public education." *Id*., 454 F.3d at 38. On this basis, the court concluded that there was a sufficient history of unconstitutional discrimination to justify prophylactic legislation. *Id*. at 38-39.

The First Circuit then assessed whether Title II, as applied to public education, was a congruent and proportional response. *See id*. at 39. The court noted that by requiring affirmative accommodations, Title II does go beyond what is required by the Fourteenth Amendment, but that it does so to protect against the historical discrimination against students with disabilities. *See id*. The court also found the obligations imposed by Title II were limited in important ways, including minimizing costs to impacted entities, given that entities need not make accommodations or modifications that pose an undue burden or cause a fundamental alteration, and this limited burden was proportionate and justified given "the persistent pattern of exclusion and irrational treatment

of disabled students in public education, coupled with the gravity of the harm worked by such discrimination." *Id.*

The analysis of the First Circuit in *Toledo,* applying the standard adopted by the Tenth Circuit in *Guttman*, applies equally here. The constitutional right at issue, in addition to a prohibition on irrational disability discrimination in any context, is the prohibition on irrational disability discrimination in public education at all levels, a violation of which Congress found continued on a widespread basis despite efforts to address it. *Toledo*, 454 F.3d at 36-38.

Title II, with its modest requirement that institutions of public education provide reasonable accommodation where they do not impose an undue burden or fundamental alteration, avoid impermissible disability discrimination, and, by virtue of Section V of the ADA, avoid retaliation for students' efforts to oppose prohibited acts or enforce their rights, is more than congruent and proportional to the findings of exclusion and the extent of harm that occurs when educational institutions unconstitutionally discriminate. *Id.* at 39. Like the issue of physical access in *Lane,* which was not a constitutional right itself but rather implicated other fundamental rights, education is similarly a pathway to exercising one's fundamental rights and has been described at any level as vital and foundational, necessary to enable individuals to "earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." *See Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493-495 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) (addressing the role of "public education" generally, including at the university level, and harm of exclusion at all levels, in reaching its holding).

Against this vital interest, Title II is limited in scope. *Lane,* 541 U.S. at 532. It only protects those who have a disability and are otherwise qualified for the program or service they

seek. *Id.* at 531–532. Title II does not require all possible measures but only "reasonable" accommodations and modifications that do not fundamentally alter the service provided. *Id.* Its limit on requiring only reasonable accommodations therefore minimizes the costs imposed on universities to comply. *See City of Boerne*, 521 U.S. at 534 (noting that congruence and proportionality concerns are highest where compliance with the federal statute entails "substantial costs" that "far exceed any pattern or practice of unconstitutional conduct").

This Court should therefore find that Title II validly abrogates a state's sovereign and Eleventh Amendment immunity.[1]

## CONCLUSION

For the reasons stated above, Plaintiff requests that this Court deny Defendants' Motion for Judgment on the Pleadings with respect to her ADA claim.

DATED this 20th of May, 2025.

Respectfully submitted,

**BROWN, CURRY & DUGGAN, LLC**

*/s/ Sarah A. Brown*
Sarah A. Brown KS #12130
Dan Curry, KS #22750
1600 Genessee St., Suite 956
Kansas City, MO 64102
Telephone: (816) 756-5458
Facsimile: (816) 666-9596
sarah@brownandcurry.com
dan@brownandcurry.com

and

---

[1] Defendants acknowledge that the relevance of the distinction between the two comes into play solely with respect to whether the claim is dismissed with or without prejudice.

**THE BACH LAW FIRM, LLC**

*    /s/ Jason J. Bach*
*Admitted Pro Hac Vice*
7881 W. Charleston Blvd., Suite 165
Las Vegas, NV 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
jbach@bachlawfirm.com

*Attorneys for Plaintiff Emily Dehn*

### CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2025, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*    /s/ Sarah A. Brown*
Sarah A. Brown KS #12130
*Attorney for Plaintiff Emily Dehn*